567 A.2d 303

**Cheryl TOCCO, Appellant,**

**v.**

**John D. TOCCO, Jr., Appellee.**

Superior Court of Pennsylvania.

Argued May 2, 1989.

Filed Oct. 12, 1989.

Reargument Denied Dec. 19, 1989.

Laurence M. Kelly, Montrose, for appellant.

Joseph P. Hester, Jr., Montrose, for appellee.

Before CAVANAUGH, TAMILIA and KELLY, JJ.

CAVANAUGH, Judge:

The parties involved in this appeal were married on June 18, 1983. They separated in August, 1985. There was a short reconciliation from February, 1986 until August, 1986 when a final separation occurred.

There was a bifurcation of the divorce and equitable distribution proceedings. A divorce decree was entered in favor of the plaintiff below, Cheryl Tocco, and no appeal has been taken from the entry of the divorce decree. A final hearing on the equitable distribution of marital property was held in January, 1988. An order was entered on June 1, 1988 directing distribution and an appeal has been taken to this court from that order.[1]

---

1. The order appealed from by O'Malley, P.J. provided:
   NOW TO WIT, this 1st day of June, 1988, it is hereby ordered and decreed that the plaintiff is awarded the amount of $14,500.00 cash,

The marriage of the parties was the second for each. Both parties had two sons from a previous marriage. John Tocco is approximately ten years older than the appellant, Cheryl Tocco, who was about thirty-two years old at the time of the marriage. When the marriage took place, the appellee had an extensive securities portfolio which he had either purchased with his own funds or inherited. He also had a farm in Montrose, Pennsylvania and two other pieces of real estate in New York State, which he rented. The appellant at that time owned a house in Montrose, Pennsylvania and was employed as a personnel manager at Savin Corporation.

After the parties were married, they worked together on appellee's farm, known as Foxglove Farm, and endeavored to breed and sell Arabian horses. The farm was owned by the appellee at the time of the marriage and after he was married, he purchased several horses. However, the business did not prosper and operated at a loss during the entire time of the marriage. The value of the horses decreased drastically.[2]

the valuation of one-half increase of the two rental properties located in Endicott, New York. Plaintiff is also awarded the amount of $5,000 cash, the valuation of ⅓ interest in the purchased horses. Plaintiff is awarded the Saab automobile. No alimony will be ordered due to the court's determination on lack of need.

2. Mr. Tocco explained the reasons for decline in value of his horses and horse farm:

Q. As of the present time, if you were to liquidate these animals, can you indicate to us the value of them—it is my understanding that the value has been somewhat reduced?

A. It has been greatly reduced.

Q. Can you explain to the court the circumstances?

A. I think there are three major reasons why the horse market has fallen so drastically. Number one was that when the horses were so high priced, of course, everybody went out and bred their mares and so within a couple of years we had more supply than demand. The second reason was that the tax changes scared a lot of people and they weren't sure whether they were going to be able to keep going with their horse farms because you really need to have your tax write offs to have a viable business in the horse business and that scared a lot of people, so people started selling horses right and left and it really brought the market way down and the other is that the horses are always a good hedge in times of

Not only did the appellee's horse farm decrease in value, but his portfolio of securities was drastically reduced. At the time of his marriage, the appellee's securities were valued well in excess of $1,000,000.00. He owned a great deal of stock in International Business Machine (IBM) and American Telephone & Telegraph (AT & T).[3] In August, 1986, when the final separation took place, the appellee's securities were worth about $1,800,000.00. However, by March, 1987, the appellee was subject to margin calls as the value of his securities against which he had borrowed money to purchase options, had dropped dramatically. In the spring of 1987, he was forced to sell the balance of his AT & T and IBM stock and the entire proceeds were used toward reducing the outstanding balance in his margin accounts. In August, 1987, the appellee sold additional securities to be used toward reducing his margin account, but even these sales did not satisfy his indebtedness. The appellee's financial situation further deteriorated as a result of the drastic sell-off in the stock market in October, 1987. By that time, the net value of his securities was reduced to about $350,000.00 which represented a loss of about $1,000,-000.00 in the value of his securities from the time of his marriage.

The appellee's assets when he married, beside real estate and securities, included horses worth about $350,000.00. However, due to a decline in the market for Arabian horses, the value in January, 1988 was only about $100,000.00. The gross value of the assets which the defendant owned at the time of his marriage was also reduced by his indebtedness to the Endicott Trust Company of New York of some $100,000.00.

The appellant owned a house in Montrose at the time of the marriage and the appellee made substantial improvements on the home. The two rental properties owned by

inflation and with inflation going down, the horse market also came down. That is the major reason for it.

**3.** At the time of his marriage, the appellee's holdings included 5,776 shares of IBM and 8,090 of AT & T.

the appellee in Endicott, New York increased in value during the marriage by about $29,000.00 and the appellant was properly awarded $14,500.00 which represented one-half of the increase in the value of the houses.

In reviewing equitable distribution of marital property, we must defer to the decision of the hearing court in the absence of an abuse of discretion. *Johnson v. Johnson*, 365 Pa.Super. 409, 529 A.2d 1123 (1987). The appellant contends that the court below erred in valuing assets as of the date of the hearing on equitable distribution which was January 7, 1988, rather than on the date of the separation of the parties. The Divorce Code does not set forth a specific benchmark date for valuation and it is appropriate for the trial court to select a date which serves to provide for economic justice between the parties. *Winters v. Winters*, 355 Pa.Super. 64, 512 A.2d 1211 (1986). The date chosen by the court in valuing marital assets will control in the absence of an abuse of discretion. *Aletto v. Aletto*, 371 Pa.Super. 230, 537 A.2d 1383 (1988). The Supreme Court in *Sutliff v. Sutliff*, 518 Pa. 378, 543 A.2d 534 (1988) affirmed the use of the date of equitable distribution for valuing assets rather than the date of the separation of the parties as substantial fluctuation occurred in the value of the assets between the two dates. The court stated at 518 Pa. at 381, 543 A.2d at 536: "It is implicit, however, in the statutory provisions governing equitable distribution that a valuation date reasonably proximate to the date of distribution must, in the usual case, be utilized."

The court properly valued the parties' assets as of January 7, 1988 which was the final date of the hearing on equitable distribution. It would have been unrealistic and inequitable in the extreme to use the date of the final separation of the parties in August, 1986 to set a valuation of the husband's property. There was a capital gain to the appellee on that date with reference to his securities, but it was unrealized. When the securities were ultimately liqui-

dated as a result of a margin call, there was no gain at all and instead, a very large capital loss.[4]

The appellant attributes the capital loss to the appellee's squandering "a large percentage of his portfolio on the folly of gambling," and alleges that he "lost over a million dollars in the stock market playing options, which was a gamble." It is true that the margin calls against the appellee's brokerage account required the sale of his securities, but the decrease in value of the underlying securities, which were sound investments, was beyond his control. Further, the appellee did well with his investments in options in 1986, although he lost over $1,000,000.00 on options in 1987. The decrease in the value of the appellee's investments after his marriage was due to market forces beyond his control. While trading in the option market has a high degree of risk, all investments in the stock market involve risk as there is no guarantee that the value of one's principal will remain constant.

The Pennsylvania Divorce Code 23 Pa.S.A. § 401(e) provides in pertinent part:

(e) For purposes of this chapter only, "marital property" means all property acquired by either party during the marriage, including the increase in value prior to the date of final separation of any nonmarital property acquired pursuant to paragraphs (1) and (3), except:

(1) Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage.

.    .    .    .    .

(3) Property acquired by gift, except between spouses; bequest; devise; or descent.

Appellant argues that there was an increase of about $550,000.00 in the value of the appellee's securities from the date of marriage until the date of final separation and that

4. Under the Internal Revenue Code, there is no capital gains tax until a gain is realized by a sale or exchange of property. The tax laws illustrate the folly of attempting to equitably distribute a mere paper gain on an asset that is not present when the asset is sold.

the increase in value represented marital property in which she was entitled to equitable distribution. This argument ignores the reality of the situation. As noted above, the capital gain was unrealized by the appellee and when the securities were ultimately sold, they had a value far less than their value not only on the date of final separation in 1986, but also on the date of the marriage in 1983. The gain as of the date of separation, as far as being marital property, is illusory. When the appellee's assets were valued at the time of equitable distribution, any gain had vanished. Appellant cannot expect to be awarded a share in an asset that does not exist. In January, 1988 the appellee's assets were very substantially depleted from what they had been at the time of the marriage. In addition, he was deeply in debt and had to borrow money to meet his current obligations, including support that he was paying to the appellant.

Our *en banc* decision in *Anthony v. Anthony*, 355 Pa.Super. 589, 514 A.2d 91 (1986) does not compel a different result. In *Anthony, supra,* one spouse owned real estate at the time of the marriage which was then worth $43,-500.00 and was valued at $65,000.00 at the time of the parties' separation. We affirmed the order of the court below, holding that the increase during the parties' marriage in the value of the real estate was marital property subject to equitable distribution. However, the property in *Anthony* had increased in worth at the time of its valuation. We also must read *Anthony* in light of the Supreme Court's recent decision in *Sutliff v. Sutliff, supra,* which approves the valuation of assets at the time of equitable distribution. In *Aletto v. Aletto, supra,* we held that the increase in value of stock owned by the wife at the time of her marriage to the date of hearing on equitable distribution was marital property, and that there was no abuse of discretion in valuing assets as of the date of the hearing rather than the date of separation. *Winters v. Winters, supra,* involved a situation analogous to our own. The husband had an interest in a trust established by his father,

which increased in value after his father's death. The value of the trust at the date of separation was considerably higher than the value on the date of the equitable distribution hearing. We held that the court below properly valued the trust as of the date of the hearing.

The appellant's financial picture is, relatively speaking, better than the appellee's. When she married, she was employed at Savin Corporation which subsequently entered bankruptcy. She owned a home in Montrose, Pennsylvania, which she considered to be the basis of her security.[5] During the marriage, the appellee made improvements on the appellant's home at his own expense. Further, the appellee's father presented a gift of $10,000.00 to the appellant so that she could make investments of her own. The appellee also gave the appellant a new Chrysler automobile and the court awarded a Saab automobile to her as part of equitable distribution. Finally, the appellant is now working in a position at a salary higher than she received before her marriage and in the same field of personnel management.

5.  Appellee was desirous of entering a pre-marital agreement since he and appellant had previously married and each had two children. The appellant originally agreed to it but then refused to sign the agreement when it was prepared. She testified concerning the agreement:

> We worked out between the two of us, we talked about it. My main concern and my main concern about getting married or anything was security. My security is the property that I purchased for my sons and myself in Montrose. That is why we wanted the pre-nuptial because I was scared that something would happen and we might lose it. We talked about protecting our properties so that they would never come, if anything ever happened that I would still be secure with my own personal property and he would have his personal property in Montrose and that they would never end up in a divorce battle or anything else. That is where that began.

Mr. Tocco testified that under the proposed pre-marital agreement each party waived his or her right in the assets of the estate of the other party. He testified that the appellant refused to sign, because of the following reason:

> She told me that she gave me her word that she was not in any way interested in any of my money and that basically she felt that we should trust each other and not have to have something like this and I could believe her and take her for her word.

During the marriage, the appellant enjoyed a high standard of living provided for her by the appellee. Her argument that she was a business partner in the operation of Foxglove Farm is not supported by the record. The farm was always owned by the appellee and the parties never entered a partnership agreement, nor did they file a partnership tax return, which they would have been required to do had a partnership existed. Certainly, the appellant helped her husband in running the business but the horse farm always showed a loss during the course of the. marriage. While the parties' income tax returns showed substantial income during the marriage, at the time of equitable distribution, the appellee's assets were substantially depleted. Presumably, the parties enjoyed a high standard of living during marriage, but a change in financial circumstances necessitates a corresponding change in one's living standards.

The purpose of equitable distribution is to make an award that the court deems just, and wide discretion is given to the hearing court. *Madden v. Madden*, 336 Pa.Super. 552, 486 A.2d 401 (1985). Equitable distribution is to effectuate economic justice. 23 Pa.S.A. § 102(a)(6). The Divorce Code, 23 Pa.S.A. § 401(d) sets forth various factors to be considered by the court in equitably distributing property.[6]

**6.** The relevant factors to be considered under 401(d) include:
    (1) The length of the marriage.
    (2) Any prior marriage of either party.
    (3) The age, health, station, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties.
    (4) The contribution by one party to the education, training, or increased earning power of the other party.
    (5) The opportunity of each party for future acquisitions of capital assets and income.
    (6) The sources of income of both parties, including but not limited to medical, retirement, insurance or other benefits.
    (7) The contribution or dissipation of each party in the acquisition, preservation, depreciation or appreciation of the marital property, including the contribution of a party as a homemaker.
    (8) The value of the property set apart to each party.
    (9) The standard of living of the parties established during the marriage.

The court considered all relevant factors and we discern no abuse of discretion. It included all property that was part of the marital estate and carried out its obligation to allocate the interests therein fairly. *Flynn v. Flynn,* 341 Pa.Super. 76, 491 A.2d 156 (1985).

Judgment affirmed.

(10) The economic circumstances of each party, including Federal, State and local tax ramifications, at the time the division of property is to become effective.

(11) Whether the party will be serving as the custodian of any dependent minor children.